United States District Court
Southern District of Texas
**ENTERED**
May 25, 2023
Nathan Ochsner, Clerk

**IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION**

| | | |
|---|---|---|
| MICHAEL LEWIS and REGINA ARMSTEAD, | § § § | |
| Plaintiff, | § § | |
| VS. | § § | CIVIL ACTION NO. 4:22-CV-02593 |
| ROSENBERG POLICE DEPARTMENT CITY OF ROSENBERG, JOHN DELGADO, ADAM VASQUEZ, ARTHUR LOVE, JOHN CLAUSEN, and RYAN CANTU, | § § § § § | |
| Defendant. | § | |

## ORDER

Before the Court is John Delgado, Adam Vasquez, Arthur Love, John Clausen, and Ryan Cantu's (the "Officers") and City of Rosenberg, Texas (the "City") (collectively "Defendants") Motion to Dismiss Plaintiffs Michael Lewis ("Lewis") and Regina Armstead's ("Armstead") (collectively "Plaintiffs") Complaint. (Doc. No. 18). Plaintiffs responded in opposition (Doc. No. 25), and Defendants filed a Reply. (Doc. No. 29). After reviewing the applicable law and the motions, the Court **grants in part** and **denies in part** Defendants' Motion to Dismiss.

### I. Background

According to the Complaint, that the Court must accept as true, Plaintiffs are fifty-seven and sixty-seven years old. As alleged in their Complaint, on or about 6:00 p.m. on November 6, 2020, Plaintiff Armstead was driving in her vehicle with Plaintiff Lewis when officers from the Rosenberg Police Department ("RPD") pulled their vehicle over, detained them at gunpoint, handcuffed them, searched the entirety of their vehicle, and confiscated Armstead's property.

Earlier that evening, RPD allegedly received a call from the Computer Aided Dispatch ("CAD") reporting that a group of teenagers had brandished guns in front of a group of children.

1

A caller had reported that the suspect teenagers fled in a white vehicle with tinted windows and black rims. RPD dispatched officers John Delgado, Ryan Cantu, Adam Vasquez, Arthur Love, and John Clausen (collectively "the Officers") to apprehend the teenagers. Very soon after that report, Plaintiffs were driving in a white Dodge Charger with silver hubcaps in the same area in which the Officers were told to search. Armstead was in the process of driving home with Lewis in the passenger seat.

Within five minutes of receiving the call about the teenagers, the Officers pulled over Armstead's car. When the Officers first turned on their lights and sirens, Armstead assumed the Officers were pursuing another vehicle, so she slowed down to let them pass. When the Officers instructed Armstead to pull over via the intercom system, she immediately complied with the instructions. Once stopped, the Officers used their intercom system to direct Armstead to throw her keys out the window. She did. Next, the Officers demanded that she exit the vehicle and get on her hand and knees. She, again, followed the Officers' directions. Once on the ground, they ordered her to stand up and walk backwards towards the police vehicle. Armstead, again, followed their directions. Upon reaching the vehicle, an officer grabbed her arms and handcuffed her. All of this occurred as other Officers pointed their guns at her. Once handcuffed, she was searched. While being handcuffed and searched, Armstead claims that she informed the Officers that Lewis, the passenger in her car, was a dialysis patient and that his medical condition was managed through the use of an AV Fistula in his left forearm. She also claims she informed the officers that Lewis could not have tight items, such as handcuffs, around his left arm or wrist due to his medical condition. After the Officers handcuffed Armstead, they placed her in the back of a police vehicle where she remained for the duration of the investigation, which lasted about 45 minutes.

Lewis, on the other hand, was initially instructed to remain in the vehicle, which he did. After the Officers had secured Armstead, they moved on to take Lewis into physical custody. Over the intercom, the Officers told Lewis to stick his hands outside the window. Then, four officers—one holding an assault rifle—ordered Lewis out of the vehicle and onto the ground. In response, Lewis stated that his age (67 years old) prevented him from kneeling, yet he still lowered himself to his knees. The Officers then handcuffed Lewis. The Plaintiffs claim Lewis also informed the Officers of the stint in his hand and told the Officers that his doctor had instructed him not to put anything on his hands or wrists. Nevertheless, the Officers handcuffed Lewis. Lewis was subsequently pulled to his feet and placed in the back of a separate police vehicle. He remained there for approximately 20 minutes.

While the Plaintiffs were in the back of the police vehicles, the Officers conducted a search of Armstead's vehicle that lasted approximately 20 minutes. One Officer also confiscated Armstead's cell phone during this time. The Officers found no weapons, contraband, or other evidence of illegal activity during the vehicle's search. Following the search, the Officers let Lewis and Armstead out of the police vehicles, removed their handcuffs, and permitted them to leave the scene.

On the drive home, Armstead realized she did not have her phone, house keys, or the vehicle key fob.[1] Armstead used Lewis's cellphone to call the Rosenberg Police Department and explain she was missing certain items. The operator instructed Armstead to return to the scene of the stop where an officer would meet her. When the Plaintiffs returned, they were met by Officer Love and another officer. The Officers returned her phone and helped locate her keys. Ultimately, the keys were found in the street, but the vehicle key fob, presumably in the intervening time

---

[1] Plaintiffs allege they were able to start the vehicle and drive home because the missing fob was in close proximity to the car when they drove away. (Doc. No. 1 at 8).

3

period, had been crushed. Officer Love instructed Plaintiffs to get a receipt for the cost of replacing the fob, submit the receipt to the Rosenberg Police Department, and the Rosenberg Police Department would reimburse them for their expenses. Armstead followed the Officer's instructions but were never reimbursed for the vehicle fob.

Additionally, as a result of the handcuffing, Lewis's medical device in his wrist malfunctioned. Lewis had to undergo three separate medical procedures to replace the fistula.[2]

## II. Case History

Plaintiffs brought a civil rights action under 42 U.S.C. § 1983, Title II of the Americans with Disabilities Act, and Texas state law concerning the alleged illegal and violent detention, search, arrest, and seizure. In their complaint, Plaintiffs allege that RPD officers have an extensive and well-documented history of conducting violent stops and arrests, routinely using severe force against civilians, and regularly detaining civilians in an aggressive manner. Additionally, Plaintiffs claim that they were unlawfully detained, falsely arrested, illegally searched, and that the Officer used excessive force, violated the Americans with Disabilities Act ("ADA"), illegally seized their property, and are guilty of civil theft and/or conversion. In response to Plaintiffs' allegations Defendants filed a Motion to Dismiss, arguing that Plaintiffs failed to allege facts which state a plausible claim for relief because (1) Plaintiffs do not make out a claim of a violation of the Fourth Amendment; (2) the individual Defendants are entitled to immunity; (3) Plaintiffs fail to allege plausible factual allegation under the ADA; (4) Plaintiffs' state law tort claims against the City are barred by governmental immunity not waived by the Texas Tort Claims Act; (5) the Texas Tort Claims Act election of remedies provision bars suit against the individual city employees; and (6)

---

[2] While the term "fistula" is often used to refer to a physical abnormality (passageway), it can also be used to describe a surgically made passageway, and the Court assumes that is how it is being used here.

Plaintiffs' allegations do not state a *Monell* claim against the City. Plaintiff responded in opposition (Doc. No. 25), and Defendants filed a reply. (Doc. No. 29).

### III. Legal Standard

A defendant may file a motion to dismiss a complaint for "failure to state a claim upon which relief may be granted." Fed. R. Civ. P. 12(b)(6). To defeat a motion to dismiss under Rule 12(b)(6), a plaintiff must plead "enough facts to state a claim to relief that is plausible on its face." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007). "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Ashcroft v. Iqbal*, 556 U.S. 662, 663 (2009) (citing *Twombly*, 550 U.S. at 556). "The plausibility standard is not akin to a 'probability requirement,' but it asks for more than a sheer possibility that a defendant has acted unlawfully." *Id.* (quoting *Twombly*, 550 U.S. at 556). "Where a complaint pleads facts that are 'merely consistent with' a defendant's liability, it 'stops short of the line between possibility and plausibility of entitlement to relief.'" *Id.* (quoting *Twombly*, 550 U.S. at 557).

In reviewing a Rule 12(b)(6) motion, the court must accept all well-pleaded facts in the complaint as true and view them in the light most favorable to the plaintiff. *Sonnier v. State Farm Mut. Auto. Ins. Co.*, 509 F.3d 673, 675 (5th Cir. 2007). The Court is not bound to accept factual assumptions or legal conclusions as true, and only a complaint that states a plausible claim for relief survives a motion to dismiss. *Iqbal*, 556 U.S. at 678–79. When there are well-pleaded factual allegations, the court assumes their veracity and then determines whether they plausibly give rise to an entitlement to relief. *Id.*

## IV. Discussion

### A. Qualified Immunity

As mentioned, Defendants urge the Court to grant their motion because Plaintiffs did not make out a claim of a violation of the Fourth Amendment or the ADA. Alternatively, Defendants contend dismissal is proper as to the individual Defendants because Plaintiffs' claims are insufficient to overcome the Officers' qualified immunity defense.

Qualified immunity protects government officials "from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." *Pearson v. Callahan*, 555 U.S. 223, 231 (2009). The purpose of qualified immunity is to protect officials from harassment, distraction, and liability when they perform their duties reasonably, but to hold public officials accountable when they exercise their powers irresponsibly. *Id.* When an official should have known that his conduct would violate the plaintiff's constitutional rights, he or she is not entitled to qualified immunity. *White v. Pauly*, 137 S. Ct. 548, 552 (2017).

"When a defendant invokes qualified immunity, the burden is on the plaintiff to demonstrate the inapplicability of the defense." *Modica v. Taylor*, 465 F.3d 174, 179 (5th Cir. 2006) (citations omitted). Determining whether qualified immunity applies is a two-step process. *Id.* First, the court considers whether the facts the plaintiff alleges make out a violation of a constitutional right. *Id.* If the plaintiff satisfies the first step, the court must ask whether the right at issue was "clearly established" at the time of the defendant's alleged misconduct. *Id.* "To answer that question in the affirmative, [the Court] must be able to point to controlling authority—or a robust consensus of persuasive authority—that defines the contours of the right in question with a high degree of particularity." *Morgan v. Swanson*, 659 F.3d 359, 371–72 (5th Cir. 2011) (en banc) (quotation and citation omitted). "A clearly established right is one that is sufficiently clear that

every reasonable official would have understood that what he is doing violates that right." *Mullenix v. Luna*, 577 U.S. 7, 11 (2015) (internal marks omitted). The Court will analyze the two-step process for each alleged cause of action.[3]

### 1. Detention/Seizure

First, Defendants challenge Plaintiffs' ability to state a claim of unlawful detention. Defendants argue they had "at least reasonable suspicion to allow a *Terry Stop*." (Doc. No. 18 at 17). Defendants reason, they "may have rationally inferred the potential the occupants of Plaintiffs' vehicle -- a White Dodge Charger - were the people who reportedly committed a crime involving weapons based an active 'weapons call' from dispatch reporting fleeing suspects in a white vehicle with tinted windows and black rims just five-minutes before officers saw the Plaintiffs' vehicle in the area of the call." (Doc. No. 18 at 17). Plaintiffs, on the other hand, contend that the stop was a *de facto* arrest. Alternatively, the Plaintiffs argue that if the Court finds that the seizure can be classified as a *Terry* stop, that the detention was still unreasonable under the Fourth Amendment because "Defendants lacked reasonable suspicion to detain [Plaintiffs], who clearly did not match the description of the teenaged suspects." (Doc. No. 25 at 12). As a last resort, Plaintiffs state if the Officers did have reasonable suspicion to stop them, the investigatory stop was conducted in an unreasonable manner. (Doc. No. 25 at 12).

The Fourth Amendment protects individuals from unreasonable searches and seizures. Traffic stops are considered seizures within the meaning of the Fourth Amendment. *See U.S. v. Banuelos–Romero*, 597 F.3d 763, 766 (5th Cir.2010). The legality of seizures/traffic stops for Fourth Amendment purposes is analyzed under the standard articulated by the Supreme Court in

---

[3] Defendants argue that Plaintiffs failed to state any Fourth Amendment claims and that Plaintiffs fail to allege facts to overcome any of the officer's qualified immunity defenses. Since the first step of the qualified immunity analysis is whether the facts the plaintiff alleges make out a violation of a constitutional right, the Court will consider Defendants' 12(b)(6) arguments simultaneously as the qualified immunity contentions.

*Terry v. Ohio*, 392 U.S. 1 (1968). To analyze the legality of a vehicle stop under *Terry*, the Court must follow the two-step process. *United States v. Brigham*, 382 F.3d 500, 506 (5th Cir. 2004). The first step considers whether the officer was justified in stopping the vehicle at its inception. *Id.* The second step examines whether the officer's subsequent actions were reasonably related in scope to the circumstances that justified the stop. *Id.*

In the context of the first prong, "if police have a reasonable suspicion, grounded in specific and articulable facts, that a person they encounter was involved in or is wanted in connection with a completed felony, then a *Terry stop* may be made to investigate that suspicion." *United States v. Hensley*, 469 U.S. 221, 229 (1985). "[A]n alert or BOLO report may provide the reasonable suspicion necessary to justify an investigatory stop." *Davila v. United States*, 713 F.3d 248, 258 (5th Cir. 2013) (citing *United States v. Rodriguez*, 564 F.3d 735, 742 (5th Cir. 2009)).

In determining the legality of the traffic stop, the Court must first determine if the Officers' conduct was justified at the inception. It is undisputed that the RPD Officers received a "weapons call" from CAD, reporting that a group of black teenagers had brandished guns in front of a group of kids. As mentioned, the caller indicated that the teenagers fled the scene in a white vehicle with tinted windows and black rims. While Plaintiffs did not match the physical description of "teenagers," Armstead's vehicle was similar to the detailed description of the getaway vehicle and was located in the general area as the incident.[4] Both the car in the alert and the car the Plaintiffs were in had tinted windows that would make it difficult to accurately identify or even categorize the people inside. Additionally, given the fact that the stop occurred at dusk, differences between the cars may not have been readily apparent. Considering these facts, the Officers clearly had

---

[4] The weapons call reported he vehicle as a white vehicle with black rims. Plaintiffs' car, on the other hand, had silver hubcaps. The initial stop was nevertheless lawful since this could qualify as a "reasonable but mistaken judgment[ ]" that is not "plainly incompetent." *See Stanton v. Sims*, 571 U.S. 3, 6 (2013).

reasonable suspicion to conduct an investigatory stop. *See United States v. Campbell*, 178 F.3d 345 (5th Cir. 1999) (holding that officers had reasonable suspicion to conduct a *Terry* stop where the individual "matched the physical description of the bank robber from the day before and was approaching a car that matched a detailed description of the getaway vehicle and bore the same license plate."). The Court, therefore, concludes that Plaintiffs' allegations do not state a claim that make out a violation of a constitutional right in regard to the initial detention, and thus, the Officers are immune from Plaintiff' unlawful detention allegations. Additionally, the Court finds that Plaintiffs have no pled sufficient facts to establish an unconstitutional detention and would alternatively dismiss under Rule 12(b)(6).

Additionally, the pat down of Armstead and Lewis were valid under *Terry*. "When an officer is justified in believing that the individual whose suspicious behavior he is investigating at close range is armed and presently dangerous" he may conduct a limited protective search for concealed weapons. *Terry*, 392 U.S. at 24. Here, the Officers' pat down of Plaintiffs was reasonable as they had received a call that suspects in a similar vehicle were seen brandishing weapons. Thus, they knew the wanted individuals were armed and therefore, officer safety was at issue. Consequently, the Officers were justified in performing a limited frisk to protect themselves.

It is important to note that some courts have held a criminal defendant was unlawfully seized under *Terry* where the police based his reasonable suspicion on an unreliable tip from a 9-1-1 caller, giving a description as to the suspect's age, race, clothing, and location. *United States v. Wali*, 811 F. Supp. 2d 1276, 1286 (N.D. Tex. 2011). As far as the Court can tell, Plaintiffs have not questioned the reliability of the caller's tip, so any such argument is waived. Assuming arguendo, however, that Plaintiffs did allege the caller was not reliable, there is still not a constitutional violation. The limited number of cases on this matter concern factually distinct

scenarios which do not amount to clearly established law. Thus, in the case there was a constitutional violation, the Officers would still be entitled to qualified immunity.

Accordingly, the Court grants Defendants' motion as it relates to Plaintiffs' unlawful detention claims as to the traffic stop and their initial frisk of the Plaintiffs.

2. False Arrest

Next, Defendants challenge Plaintiffs' false arrest claims. Defendants claim that "Plaintiffs fail to allege any facts to show their investigatory stop ever changed to an arrest." (Doc. No. 18 at 18). Plaintiffs respond, arguing the "detention" was an arrest because "[t]raining guns on an innocent person, handcuffing them, and placing them in the back of a police vehicle can constitute... a restraint on freedom." (Doc. No. 25 at 9). While the Officers were within their rights to temporarily detain Plaintiffs, a question remains as to whether the Officer's subsequent conduct such as pointing weapons at Plaintiffs, ordering them to kneel on the ground, handcuffing them, and placing them in a squad car amounted to a warrantless arrest under the Fourth Amendment.

The Fifth Circuit has noted that, "[t]he line between a valid investigatory stop and an arrest requiring probable cause is a fine one." *United States v. Hanson*, 801 F.2d 757, 763 (5th Cir. 1986). "[I]f unjustifiably prolonged, a *Terry* stop 'can, due to its duration, transform into the equivalent of an arrest.'" *Smith v. Heap*, 31 F.4th 905, 911 (5th Cir. 2022) (citing *United States v. Massi*, 761 F.3d 512, 522 (5th Cir. 2014)). "Clearly, using some force on a suspect, pointing a weapon at a suspect, ordering a suspect to lie on the ground, and handcuffing a suspect—whether singly or in combination—do not automatically convert an investigatory detention into an arrest requiring probable cause." *United States v. Sanders*, 994 F.2d 200, 206 (5th Cir. 1993). Although, as the Fifth Circuit expressly stated, "[that] holding is not to be interpreted as meaning that the police are automatically authorized to employ [those] procedures in every investigatory detention." *Id.*

Instead, the relevant inquiry is one of reasonableness under the circumstances. *Id.* The question for the court is "whether the police were unreasonable in failing to use less intrusive procedures to conduct their investigation safely." *Id.* at 206-07.

As Plaintiffs allege in their Complaint, when they first saw the lights and sirens from the RPD vehicles, Armstead assumed the Officers were pursuing another driver, so she slowed down and moved over to let them pass. (Doc. No. 1 at ¶ 20). When the Officers instructed her to pull over she abided by their instructions. (Doc. No. 1 at ¶ 20). She continued to comply with the Officers' directions: throwing the keys out the window, kneeling on the ground, and walking backwards slowly toward the police vehicles. (Doc. No. 1 at ¶ 21). Once she reached the Officers she was handcuffed. (Doc. No. 1 at ¶ 21). Two other officers kept their guns pointed at her while a third officer searched her person. (Doc. No. 1 at ¶ 22). Finding nothing, she was placed in the back of a police vehicle where she remained for the duration of the investigation, "which lasted approximately 45 minutes." (Doc. No. 1 at ¶ 24). Lewis was likewise ordered to "stick his hands outside of the Dodge Charger window." (Doc. No. 1 at ¶ 25). Four armed officers—one allegedly holding an assault rifle—ordered Lewis out of the vehicle and onto his knees. (Doc. No. 1 at ¶ 24). Lewis was handcuffed and placed in the back of a separate police vehicle where he remained for about twenty minutes. (Doc. No. 1 at ¶ 26).

Considering these allegations as true, the Officers were unreasonable in failing to use less intrusive procedures to conduct their investigation properly and safely. *Compare with United States v. Jordan*, 232 F.3d 447, 450 (5th Cir. 2000) (holding, under the circumstance, it was not unreasonable for police to handcuff the defendant "long enough to frisk him" where he refused to place his hands on the hood of the car and acted nervously and aggressive.). As the Complaint reads, the Officer's first spoken words were commands to throw the keys out the window, to exit

the vehicle, and get on the ground. After seeing the Plaintiffs, the Officers undoubtedly knew Armstead and Lewis did not match the physical description of the missing suspects.[5] They would also clearly note—once it was stopped—the car did not match the description of the wanted car. A reasonable officer would have recognized the large gaps between the suspects' ages and the Plaintiffs' ages and quickly realized they pulled over the wrong white car[6] and once assured there were no weapons would have concluded the stop. Such conduct would constitute less intrusive procedures without injuring the Plaintiffs and without compromising their own safety. Instead, the Officers continued pointing weapons at the Plaintiffs, ordered them on the ground, handcuffed them, and placed them in police cars for an extended period of time. This conduct transformed the *Terry stop* into an arrest. *See e.g., United States v. Zavala*, 541 F.3d 562, 579 (5th Cir. 2008) (court held the criminal defendant's detention, which exceeded 90 minutes "morphed from a *Terry* detention into a de facto arrest" where defendant was handcuffed, placed in back of police car, transported to different locations, and was not free to leave.).

The arrest, however, was not unlawful if the Officers had probable cause. *See Michigan v. DeFillippo*, 443 U.S. 31, 37 (1979). Probable cause "requires only a probability or substantial chance of criminal activity, not an actual showing of such activity." *Illinois v. Gates*, 462 U.S. 213, 323 (1983). Here, the Officers do not allege that probable cause existed to arrest Plaintiffs, and considering the allegations, that the Court must accept as true at this stage, it is easy to conclude the Officers did not have probable cause. There are no facts that support the conclusion that, after

---

[5] The weapons call reported that a group of "Black teenagers" had brandished guns. Armstead and Lewis hardly qualify as a group, and they were fifty-seven and sixty-seven years old at the time of the incident.

[6] White is the most popular color of cars. Jim Gorzelany, *Here's Why the Most Popular Car Colors are Also the Dullest* (May 524, 2023, 12:19 PM), https://www.forbes.com/sites/jimgorzelany/2022/10/04/heres-why-the-most-popular-car-colors-are-also-the-dullest/?sh=2b2aceda37f5.

12

the Plaintiffs exited the vehicle, there was any chance of criminal activity. Therefore, Plaintiffs'

claims are sufficient to support an unlawful arrest cause of action at the motion to dismiss stage.

Having found Plaintiffs' allegations make out a violation of a constitutional right, the next

question is whether the right at issue was "clearly established" at the time of the Officers' alleged

misconduct. The Plaintiffs claim the detention lasted about 45 minutes. After realizing the

Plaintiffs did not match the description of the suspects, there was no reason to keep Plaintiffs

detained. Moreover, a cursory look inside the car would have confirmed that fact. The Defendants

offer no reason to support the lengthy detention of Plaintiffs. The Court holds at the motion to

dismiss stage, the clearly established law supports the Plaintiffs' claim that the once lawful *Terry*

stop was converted to an unlawful arrest. *United States v. Roch*, 5 F.3d 894, 897 (5th Cir. 1993)

(court held that arresting officer's actions escalated beyond an investigative stop to an arrest where

the plaintiff voluntarily stopped his truck and the "first words spoken by the police officer who

had his gun drawn was a command for [Defendant] to get face down on the ground, and then,

without further inquiry, [Defendant] was handcuffed"); *compare with Windham v. Harris Cnty.*,

Texas, 875 F.3d 229 (5th Cir. 2017) (holding that a 90-minute traffic stop was not converted to an

arrest where the Officer reasonably had to wait on a certified drug recognition expert to arrive to

determine the individual's impairment).

### 3. Illegal Search

Armstead also brought an unlawful search claim, challenging the lawfulness of the

Defendants' search of her vehicle. The Defendants contest Armstead's allegation, contending they

had "probable cause based upon exigency, to conduct a warrantless search of Plaintiff's vehicle."

They allege that the probable cause is "based on the dispatch report of armed suspects in a vehicle

matching the description of the Plaintiffs' vehicle coupled with Plaintiff Armstead's admitted

13

hesitancy in stopping the vehicle when haled." (Doc. No. 18 at 18). Conversely, Plaintiffs respond that the warrantless search of the vehicle was unlawful. (*See* Doc. No. 25 at 16). Plaintiffs believe once it was evident Plaintiffs "did not match the description of the suspect," any reasonable suspicion Rosenberg Police Department should have had dissipated. (Doc. No. 25 at 16).

Generally, warrantless searches are unreasonable under the Fourth Amendment. *United States v. Hernandez*, 901 F.2d 1217 (5th Cir. 1990). There are three exceptions that justify the warrantless search of a vehicle: (1) a search incident to a lawful arrest of an occupant of the automobile; (2) a "vehicle frisk" during a *Terry* stop; and (3) a search under the "automobile exception" where exigent circumstances are present. *United States v. Basey*, 816 F.2d 980, 991 (5th Cir. 1987). An officer is also permitted to seize evidence inside a vehicle if the incriminating nature of contraband is immediately apparent in plain view. *United States v. Rhodes*, 265 F. App'x 382 (5th Cir. 2008). As discussed, assuming the facts in the Complaint to be true, the Officers did not lawfully arrest Plaintiffs. Therefore, the first exception is not applicable. Additionally, the plain view exception does not apply because the Officers did not see any contraband in plain view before searching the vehicle. The Court, however, will consider whether the Officers' automobile search complied with the second or third exceptions, starting with the vehicle frisk exception.

Unlike a search incident to lawful arrest, police cannot conduct automobile searches whenever they conduct an investigative stop under *Terry*. *Michigan v. Long*, 463 U.S. 1032, 1050 (1983) ("We stress that our decision does not mean that the police may conduct automobile searches whenever they conduct an investigative stop."). Instead, "officers who conduct area searches during investigative detentions must do so only when they have the level of suspicion identified in *Terry*." *Id*. In other words, police officers must have reasonable suspicion to conduct a vehicle frisk under *Terry*. Like the initial seizure, the "officer's reasonable suspicion must be

based on the totality of circumstances confronting [him or] her, including all information available at the time [he or] she decided to stop [the individuals]." *United States v. Jackson*, 328 F. App'x 933, 935 (5th Cir. 2009). "As a corollary ... of the rule that the police may rely on the totality of facts available to them ..., they also may not disregard facts tending to dissipate reasonable suspicion." *Id.*

The Supreme Court of the United States has explicitly set limits on the scope of automobile searches under *Terry*. In particular, protective searches of vehicles are permissible "if the police officer possesses a reasonable belief based on specific and articulable facts which, taken together with the rational inferences from those facts, reasonably warrant the officers in believing that the suspect is dangerous and the suspect may gain immediate control of weapons." *Id.* at 1049. The "search of the car [is] restricted to those areas to which [an individual] would generally have immediate control, and that could contain a weapon." *Id.* at 1050.

The Defendants do not state, and the Court does not see, any reason the Officers could believe the Plaintiffs were "dangerous" at the time they searched Armstead's automobile. Additionally, there was no fear that Plaintiffs would gain immediate control of any alleged weapons, as they were both handcuffed and placed in the back of police cars when the Officers conducted the search. The Officers search of Plaintiffs' vehicle, as alleged, did not comply with the permissible vehicle frisk as set out by the Supreme Court of the United States in *Michigan v. Long*, 463 U.S. 1032, 1050 (1983). Therefore, Plaintiffs sufficiently alleged enough facts to state an unconstitutional search claim.

Considering the second prong of the qualified immunity defense, the law on this matter is clearly established. *See Club Retro, L.L.C. v. Hilton*, 568 F.3d 181 (5th Cir. 2009) (finding the search and seizures of individual plaintiffs "far exceeded the limited, non-threatening intrusions

that Terry permits where there were "no particularized determinations by the deputy sheriff that any of the individual plaintiffs were presently committing crimes or armed and dangerous); *Kansas v. Glover*, U.S. 206 L. Ed. 2d 412, 140 S. Ct. 1183 (2020) (giving the example that "if an officer knows that the registered owner of the vehicle is in his mid-sixties but observes that the driver is in her mid-twenties, then the totality of the circumstances would not 'raise a suspicion that the particular individual being stopped is engaged in wrongdoing.'"); *compare with Michigan v. Long*, 463 U.S. 1032, 1050 (1983) (holding the circumstances justified searching an individuals vehicle when it was late at night in a rural area and the individual was driving at excessive speed, swerved into the ditch, appeared intoxicated, and the officers saw a large knife in the interior of the car).

The Defendants contend the third exception—the automobile exception—also applied. The Defendants argue they "had probable cause, based upon exigency, to conduct a warrantless search of Plaintiffs' vehicle based on the dispatch report of armed suspects in a vehicle matching the description of the Plaintiffs' vehicle coupled with Plaintiff Armstead's admitted hesitancy in stopping the vehicle when haled." (Doc. No. 18 at 18).

Under the automobile exception, law enforcement may conduct a warrantless search of a vehicle if "(1) the officer conducting the search had 'probable cause to believe that the vehicle in question contain[ed] property that the government may properly seize'; and (2) exigent circumstances justified the search." *United States*, 597 F.3d at 767 (citations omitted). In a vehicle stop on a roadway, "the fact of the automobile's potential mobility supplies the requisite exigency." *United States v. Sinisterra*, 77 F.3d 101, 104 (5th Cir.1996). As to the probable cause element, permissible searches under the automobile exception "must be based not merely upon probable cause to believe that a crime has been committed, but upon probable cause to believe that contraband or other such evidence that the government could properly seize is contained in the

vehicle." *United States*, 901 F.2d at 1220. When "trustworthy facts and circumstances within the officer's personal knowledge would cause a reasonably prudent man to believe that the vehicle contains contraband," probable cause exists to search an automobile. *United States v. Edwards*, 577 F.2d 883, 895 (5th Cir.) (en banc), cert. denied, 439 U.S. 968, 99 S.Ct. 458, 58 L.Ed.2d 427 (1978).

While the dispatch report provided the Officers with reasonable suspicion to pull over the vehicle (based on the similarity of Armstead's vehicle and the suspect's vehicle), it did not provide probable cause for a full vehicle search. Upon seeing the passengers of the car were two elderly individuals and not teenagers, and the dissimilarities of the vehicles, the Officers had no reasonable reason to believe the vehicle contained any sort of contraband or evidence of a crime. Moreover, the Plaintiffs were handcuffed and in the back of the police vehicles. The Plaintiffs did not have the keys to the car. The car was not mobile; it was not going anywhere. As alleged, no exigent circumstances existed. Thus, Armstead succeeded in stating a claim as to the illegal search.

The Officers are not entitled to qualified immunity on this issue because the law is clearly established. *See United States*, 597 F.3d 763 (acknowledging that not even "fitting a drug courier profile will not suffice to raise probable cause to search a vehicle"); compare with *Webb v. Arbuckle*, No. CIV.A. 09-615, 2011 WL 1002109, at *8 (W.D. La. Mar. 18, 2011), aff'd, 456 F. App'x 374 (5th Cir. 2011) (concluding officers had probable cause to search a vehicle where the individual exited the interstate after a "narcotics checkpoint" sign and admitted to having controlled dangerous drugs in her medical bag without a prescription).

Therefore, at the motion to dismiss stage, Armstead's unlawful search claim survives, and Defendant's motion to dismiss as it relates to Plaintiff's Fourth Amendment unlawful search

17

claims is denied since there are enough facts alleged to support their claim and the law is clearly established that the Officers' acted unlawfully. [7]

### 4. Illegal Seizure

As to the illegal seizure cause of action, Plaintiffs maintain that "Defendants deprived Ms. Armstead of her Fourth Amendment right to be free from unreasonable seizures of her property" when they seized her cell phone without a search warrant or her consent.[8] (Doc. No. 1 at ¶ 103). Defendants, on the other hand, argue "failure to return a cell phone is not unconstitutional." (Doc. No. 18 at 19). Specifically, they contend "Armstead fails to allege any meaningful interference with the cell phone to constitute a "seizure" under the Fourth Amendment." (Doc. No. 18 at 19).

As the Supreme Court of the United States has explained, a "seizure" of property occurs when "there is some meaningful interference with an individual's possessory interests in that property." *United States v. Jacobsen*, 466 U.S. 109, 113 (1984).

As outlined in the Complaint, one of the four officers confiscated Armstead's cell phone during the search of the interior of the vehicle. (Doc. No. 1 at ¶ 29). Armstead did not realize she did not have her phone until she got home. (Doc. No. 1 at ¶ 35). She used Lewis' phone to call RPD and explain that she was missing her phone. (Doc. No. 1 at ¶ 35). The phone operator instructed Plaintiffs to return to the scene and that an officer would meet them there. (Doc. No. 1 at ¶ 35). When the Plaintiffs returned to the scene of the scene, Defendant Love and another officer were there. (Doc. No. 1 at ¶ 35). One of the officers returned the phone. (Doc. No. 1 at ¶ 35).

Neither side has referred this Court to a case factually on point. Plaintiff's point to a case from the Southern District of Texas where the Court refused to grant summary judgment as to a

---

[7] To the extent the Complaint can be read as to the effect that Lewis is making this illegal search claim, the Defendant's Motion is granted. Lewis did not have a possessory interest in the car and no grounds for protecting a search of Armstead's car.

[8] The Complaint does not allege that the Officers seized the vehicle key fob.

Plaintiff's seizure claims. *See Moore v. City of Houston*, 2019 U.S. Dist. LEXIS 159862 at \*\*28–29 (S.D. Tex. Aug. 28, 2019). There, the plaintiff claimed the officer seized his cell phone by "tossing it into Plaintiff's vehicle before it was towed, despite the plaintiff's request that the phone be transported with him to jail." *Id.* at \*4. This case does not constitute clearly established law because of its significant distinctions. Importantly, that case was decided not on the merits but on the defendant's failure to meet his burden on summary judgment. *Id.* at \*28. The Court expressly stated that the defendant "relie[d] on cases addressing procedural-due-process claims, not Fourth Amendment seizure," and as such the court concluded the defendant "failed to meet either of his burdens on summary judgment." *Id.* Accordingly, a dispute of material fact existed, and the defendant was not entitled to summary judgment as a matter of law. *Id.*

Conversely, the Supreme Court of the United States has held that that "brief detentions of personal effects may be so minimally intrusive of Fourth Amendment interests that strong countervailing governmental interests will justify a seizure based only on specific articulable facts that the property contains contraband or evidence of a crime." *United States v. Place*, 462 U.S. 696, 103 S.Ct. 2637, 77 L.Ed.2d 110 (1983). While other circuits have held that even under *Place*, the days-long seizure of personal effects like cell phones and cameras is unreasonable. *See Robbins v. City of Des Moines*, 984 F.3d 673, 681 (8th Cir. 2021); *United States v. Babcock*, 924 F.3d 1180, 1190–91 (11th Cir. 2019). *Zinter v. Salvaggio*, 610 F. Supp. 3d 919, 949 (W.D. Tex. 2022), appeal dismissed, No. 22-50700, 2022 WL 18587913 (5th Cir. Nov. 17, 2022).

The Plaintiffs must show that "existing precedent" has "placed the statutory or constitutional question beyond debate." *Ashcroft v. al-Kidd*, 563 U.S. 731, 741; *see also Vincent v. City of Chester*, 805 F.3d 543, 549 (5th Cir. 2015) (explaining that "two out-of-circuit cases and a state-court intermediate appellate decision hardly constitute persuasive authority" clearly

establishing law). Given that Armstead's phone was missing for a small amount of time and was immediately returned once it became known that it had not been given back, the Court does not believe the allegations support a claim that the Officers meaningfully interfered with Plaintiff's property. Further, even if there was a constitutional violation, one single case—with important distinctions—does not place the constitutional question beyond debate. Since the law is unclear on whether temporarily taking a phone, and quickly returning it, is a violation of constitutional law, the Defendants are entitled to qualified immunity for the seizure-of-property claim. This claim is also dismissed.[9]

### 5. Excessive Force

Plaintiffs also make a claim for the unlawful use of excessive force. Plaintiffs claim Defendants "violated Plaintiffs' Fourth Amendment right to be free from excessive force when they held Plaintiffs at gunpoint after they discovered Plaintiffs were not armed teenagers." (Doc. No. 1 at ¶ 113) and "locked Mr. Lewis's handcuffs so tightly that it caused a long-lasting injury on his wrist that required multiple medical procedures and damaged his medical device." (Doc. No. 1 at ¶ 115). Defendants disagree, contending no officer used excessive force and arguing Plaintiffs failed to identify any case to support their claim of excessive force based on tight handcuffs." (Doc. No. 18 at 19, 24).

To succeed in proving an excessive force claim, the Plaintiffs must "establish (1) an injury (2) which resulted directly and only from a use of force that was clearly excessive, and (3) the excessiveness of which was clearly unreasonable." *Ratliff v. Aransas Cnty.*, 948 F.3d 281, 287 (5th Cir. 2020). The Court will analyze whether Plaintiffs asserted sufficient allegations in their Complaint to satisfy each element.

---

[9] Again, to the extent the Complaint can be read as including a claim by Lewis for an illegal seizure, it is denied on both qualified immunity and Rule 12(b)(6) grounds as he has not pleaded that he had any property seized.

20

*Injury*: A plaintiff must show he or she was injured to succeed on an excessive force claim. Physical injuries are not necessarily required. *See Petta v. Rivera*, 143 F.3d 895, 899 (5th Cir. 1998). Rather, psychological pain, injuries, and disabilities as the result of the use of excessive force will suffice for the injury element. *Id.*

In their Complaint, Plaintiffs enumerate many injuries. In particular, Plaintiffs state, "[a]s a result of the handcuffing during his arrest, Mr. Lewis' medical device in his wrist malfunctioned," which "resulted in three separate medical procedures to replace his fistula." (Doc. No. 1 at ¶ 41). "Minor, incidental injuries that occur in connection with the use of handcuffs to effectuate an arrest do not give rise to a constitutional claim for excessive force." *Freeman v. Gore*, 483 F.3d 404, 417 (5th Cir.2007). That said, when the action results in severe damage, tight handcuffing can constitute excessive force. *See Deville v. Marcantel*, 567 F.3d 156, 168 (5th Cir. 2009) (holding that applying handcuffs too tightly constituted excessive force where there was evidence that it caused long-term nerve damage that was severe enough to require four surgeries). While not a physical injury, the Complaint further alleges that "Armstead no longer feels safe in the presence of police" and "feels anxious whenever she sees an RPD officer." (Doc. No. 1 at ¶ 44). Lewis has also "experienced considerable emotional distress as a result of the stop" and "has had trouble with anxiety and restlessness since the incident with RPD." (Doc. No. 1 at ¶ 44). Psychological injuries may sustain a Fourth Amendment excessive force claim. *See Flores v. City of Palacios*, 381 F.3d 391, 397–98 (5th Cir. 2004) ("While certain injuries are so slight that they will never satisfy the injury element… psychological injuries may sustain a Fourth Amendment claim" for excessive force.). Therefore, these allegations satisfy the injury requirement.

*Causation*: The second element of an excessive force case requires a plaintiff to show his or her injuries were "directly and only" a result of the excessive force. Defendants argue Lewis

cannot meet this requirement since the "alleged injury was based on not the handcuffs, but rather a medical [sic] Lewis wore." (Doc. No. 18 at 19). They argue this fact "defeats the "directly and only" element of a prima facie claim of excessive force. (Doc. No. 18 at 19).

The Fifth Circuit has directly addressed this issue. Under Fifth Circuit precedent, the exacerbation of a pre-existing condition or injury can satisfy the second prong's causation requirement. *Windham*, 875 F.3d at 242. The case law is clear that the causation prong does not does not "preclude[ ] recovery for aggravation of preexisting injury caused by the use of excessive force." *Dunn v. Denk*, 79 F.3d 401, 403 (5th Cir. 1996) (en banc).[10]

As alleged in Plaintiffs' Complaint, "[a]s a result of the handcuffing during his arrest, Mr. Lewis' medical device in his wrist malfunctioned," which "resulted in three separate medical procedures to replace his fistula." (Doc. No. 1 at ¶ 41). From these allegations, which the Court must accept as true at this stage, the tight handcuffing and the pointing of the guns was the direct and only cause of the additional procedures. Plaintiffs, therefore, have satisfied the second element.

*Reasonableness*: The third prong considers whether the force used was clearly unreasonable. Whether a force is reasonable is "judged from the perspective of a reasonable officer on the scene, rather than with 20/20 vision of hindsight." *Graham v. Connor*, 490 U.S. 386, 396 (1989). "Not every push or shove, even if it may later seem unnecessary in the peace of the judge's chambers," violates the Fourth Amendment. *Id*. Courts assess "reasonableness" using and objective standard and must account for the fact that police are "forced to make split-second judgments—in circumstances that are tense, uncertain, and rapidly evolving—about the amount of force that is necessary in a particular situation." *Id*. at 397.

---

[10] A trier of fact can only compensate for injuries caused by excessive force; "[t]here can be no award for injury caused by reasonable force." *Dunn,* 79 F.3d at 403.

The Court considers the Officers' conduct towards each Plaintiff separately. As to Armstead, the Complaint alleges that the Officers used excessive force when they held her "at gunpoint for an extended period of time, after the officers should have reasonably determined that … Armstead [was] not the suspect[] for whom they were searching." (Doc. No. 1 at ¶ 112). As alleged, the Officers had their guns drawn while they handcuffed Armstead. Before securing Armstead, the Officers could not ascertain she was not one of the suspects. Additionally, at that time, Lewis was still free in the vehicle. Therefore, the Officers pointing their guns at Armstead did not constitute excessive force as it was reasonable under the circumstances. *Crane v. City of Arlington, Texas*, No. 21-10644, 2022 WL 4592035, at \*10 (5th Cir.) ("We previously held that pointing a gun can be reasonable given the circumstances"). Since Plaintiffs do not point to any other facts to support an excessive force claim as it relates to Armstead, she has failed to make out a constitutional violation for excessive force, and the Officers are entitled to immunity. Alternatively, the Court would dismiss this claim under Rule 12(b)(6) for failure to state a claim.

Looking at the entirety of the circumstances, however, Plaintiffs alleged sufficient factual allegations to support Lewis' excessive force claim. As Plaintiffs allege, the Officers kept their guns pointed at Lewis throughout the stop. Plaintiffs also allege that they both informed the Officers of Lewis' condition and fistula in his left wrist multiple times prior to the handcuffing. Proceeding to put handcuffs on the operated wrist of an elderly, disabled man who did not match the description of the missing suspects was not reasonable.

Moving on to the second prong, the Court considers whether the law in this area is clearly established. Plaintiff Lewis' right to be free from such force was clearly established at the time of the Officers' alleged misconduct. The law is clear that the degree of force an officer can reasonably employ is reduced when the individual is not combative or actively resisting. *See Darden v. City*

23

*of Fort Worth*, Texas, 880 F.3d 722, 733 (5th Cir. 2018). In the case at bar, the Plaintiffs claim that at the time of the misconduct, Officers were pointing guns and tightly applying handcuffs to an allegedly disabled man. When the arrests occurred the individuals "had a clearly established right to be free from excessive force, *Tarver v. City of Edna*, 410 F.3d 745, 753–54 (5th Cir.2005)., and it was clearly established that the amount of force that the officers could use "depend[ed] on the severity of the crime at issue, whether the suspect posed a threat to the officer's safety, and whether the suspect was resisting arrest or attempting to flee." *Bush v. Strain*, 513 F.3d 492, 502 (5th Cir.2008). Accepting Plaintiffs' version of the events, as the Court must, this case involved a traffic stop, in which Lewis' age did not match the suspects and in which Armstead's car did not match the description of the getaway vehicle. The vehicle was stopped, the driver removed, and Lewis was in the passenger seat, so the vehicle was not going anywhere. Nonetheless, the Officers kept their guns pointed at Lewis, ordered him to get on the ground, and—with knowledge that his wrist was compromised—roughly handcuffed him, and placed him in the backseat of a police car. These facts are sufficient to warrant a denial of qualified immunity because a reasonable officer would have known that the degree of force was unconstitutionally excessive under the circumstances. *See Deville*, 567 F.3d 156 (holding an officer was not entitled to qualified immunity on an excessive force claim, where he broke the driver's window with a flashlight, roughly extracted the driver to the vehicle, and applied handcuffs so tightly that they caused severe nerve damage).

When considering a Rule 12(b)(6) Motion to Dismiss, the Court must presume that the allegations within a plaintiff's complaint are true. Taken as true, Plaintiffs have sufficiently pleaded that the Officers violated a constitutional right as to Lewis, and that this right was clearly established at the time of the challenged conduct. Moreover, a qualified immunity analysis as to this claim would challenge the underlying merits of the Lewis's injuries and thus be better suited

24

for consideration in a motion for summary judgment context, rather than during a motion to dismiss, which requires the Court to solely consider the sufficiency of the complaint. Thus, Lewis' excessive force claims survive Defendants' motion to dismiss.

## B. Claim Under the Americans with Disabilities Act (ADA)

Lewis has also brought an ADA claim against the City.[11] Defendants first contend that Lewis cannot state a claim under the ADA because "Title II [of the Americans with Disability Act] does not apply to an officer's on the-street responses to reported disturbances or other similar incidents… prior to the officer's securing the scene and ensuring that there is no threat to human life." (Doc. No. 18 at 20).[12] Alternatively, Defendant argue Plaintiffs cannot show the Officers knew that Lewis suffered from a disability protected by the ADA and that his injuries qualified as a disability under the ADA. (Doc. No. 18 at 20). Plaintiffs disagree. (Doc. No. 25 at 21).

Under Title II of the ADA, "no qualified individual with a disability shall, by reason of such disability, be excluded from participation in or be denied the benefits of the services, programs, or activities of a public entity, or be subjected to discrimination by any such entity." 42 U.S.C. § 12132. "Public entities" are defined to include local governments. 42 U.S.C. § 12131(1)(A). Title II, however, "does not apply to an officer's on-the-street responses to reported disturbances or other similar incidents… prior to the officer's securing the scene and ensuring that there is no threat to human life." *Hainze v. Richards*, 207 F.3d 795, 801 (5th Cir. 2000). Thus, as a threshold matter, the Court must determine whether the scene was secure at the time Defendants allegedly violated the ADA.

---

[11] "[T]he ADA imposes respondeat superior liability so employers are vicariously liable for the discriminatory acts of their employees." *Albright v. Sheriffs Dep't Rapides Par.*, No. CIV.A. 12-2117, 2014 WL 4702579, at *4 (W.D. La. Sept. 22, 2014) (*citing Delano-Pyle v. Victoria Cnty.*, Tex., 302 F.3d 567, 574-75 (5th Cir. 2002)).

[12] The Court notes that only Lewis asserted an ADA claim, not Armstead.

At the time of the alleged ADA violation, the only other person involved (Armstead) was already handcuffed and had been placed in the back of a police vehicle. As to Lewis, the Complaint alleges that he was outside of his vehicle "on his knees." There are no facts that either of the Plaintiffs were armed or otherwise dangerous. Assuming those fact are true, which the Court must do at this stage in the litigation, the Court finds that Lewis alleged sufficient facts to support a finding that the scene was secure at the time the Officers placed Lewis in handcuffs. *Compare with Hainze*, 207 F.3d at 801 (finding the scene was not secure at time of alleged ADA violation because individual was holding a knife and walking quickly towards the officer). Thus, Title II did apply to the Officers' conduct.

Having found that Title II applies, the Court must now consider whether Lewis properly asserted an ADA claim. To make out a prima facie case under the ADA, a plaintiff must show "(1) that he is a qualified individual within the meaning of the ADA; (2) that he is being excluded from participation in, or being denied benefits of, services, programs, or activities for which the public entity is responsible, or is otherwise being discriminated against by the public entity; and (3) that such exclusion, denial of benefits, or discrimination is by reason of his disability." *Melton v. Dallas Area Rapid Transit*, 391 F.3d 669, 671–72 (5th Cir. 2004). The Defendants challenge each of the elements, so the Court will address each in turn.

### *1. Qualified Individual under the ADA*

Defendants first contend that Plaintiffs "fail to allege facts to show Lewis 'kidney disease' qualifies as a disability under the ADA, negating a *prima facie* case of this claim." (Doc. No. 18 at 21).

The ADA defines "disability to mean "(A) a physical or mental impairment that substantially limits one or more of the major life activities of such individual; (B) a record of such

an impairment; or (C) being regarded as having such an impairment." 42 U.S.C.A. § 12102(1). "A major life activity also includes the operation of a major bodily function, including but not limited to, functions of the immune system, normal cell growth, digestive, bowel, bladder, neurological, brain, respiratory, circulatory, endocrine, and reproductive functions." *Id*. at (2)(B). The determination of whether one is disabled does not depend on the name or diagnosis of the impairment but rather the effect of that impairment on the life of the individual. 29 C.F.R. § 1630, App. (1996).

The Complaint states that "Lewis suffers from kidney disease and wears a stint in his hand to treat his condition through regular dialysis treatments." (Doc. No. 1 at ¶ 6). Additionally, as alleged, Lewis has "long-lasting injury on his wrist." (Doc. No. 1 at ¶ 115). At this early phase of the case, the Court finds that Plaintiffs alleged sufficient facts to satisfy the disability element.

### 2. Discriminated Against by Public Entity

The ADA imposes an affirmative obligation on public entities "to make reasonable accommodations for disabled individuals." *Bennett–Nelson v. La. Bd. of Regents*, 431 F.3d 448, 454 (5th Cir.2005). It does not appear that the Defendants challenge this element specifically. Nevertheless, considering the facts alleged RPD did not make any accommodation, the Court holds this element is met.

### 3. By Reason of Disability

The Fifth Circuit recognizes "that a public entity's failure reasonably to accommodate the known limitations of persons with disabilities can also constitute disability discrimination under Title II." *Windham*, 875 F.3d at 235 (citing *Bennett-Nelson v. La. Bd. of Regents*, 431 F.3d 448, 454 & n.11 (5th Cir. 2005) ("[Title II] impose[s] upon public entities an affirmative obligation to make reasonable accommodations for disabled individuals.")). The Fifth Circuit "also recognize[s]

Title II claims in the specific context of police officers who fail reasonably to accommodate the known limitations of disabled persons they detain." *Windham*, 875 F.3d at 236.

A failure to accommodate claim under Title II requires proof that "the disability and its consequential limitations were known by the [entity providing public services]." *Id.* (citations omitted). "Mere knowledge of the disability is not enough; the service provider must also have understood "the limitations [the plaintiff] experienced ... as a result of that disability." *Id.* citing *Taylor v. Principal Fin. Grp., Inc.*, 93 F.3d 155, 164 (5th Cir. 1996). It is the plaintiff's burden to identify the disability and resulting limitation and request an accommodation in direct and specific terms. *Windham v. Harris Cnty.*, Texas, 875 F.3d 229, 237 (5th Cir. 2017). If the plaintiff does not request an accommodation in direct and specific terms, he can prevail only if he shows that the disability, limitation, and reasonable accommodation were open, obvious and apparent to the entity's agents. *Id.*

In this case, Lewis claims the Officers failed to reasonably accommodate his fistula and wrist sensitivity when they tightly applied his handcuffs. This allegedly resulted in him suffering greater injury. The Complaint contains allegations that both Lewis and Armstead individually informed the Officers that Lewis "had a stint in his hand and his doctor had instructed him to not put anything on his hands or wrists." (Doc. No. 1 at ¶¶ 23, 26). Moreover, there were clearly safe alternatives available. For example, he could have been locked in the back of the patrol without being handcuffed or his uncompromised arm could have been handcuffed to a secure object away from the vehicle in question.

For that reason, Lewis states sufficient facts to make out a failure to accommodate claim under Title II. The Court denies the motion to dismiss Lewis' claims against the City.

28

### *4. Intentional – Required for Compensatory Damages*

Defendants also challenge Lewis' ability to recover compensatory damages. Specifically, they claim Lewis must show that discrimination was intentional to recover compensatory damages under the ADA. (Doc. No. 18 at 21). Plaintiffs responded that they "have included facts that would support a finding of intentional discrimination" and that "[e]ven if they had failed to plead facts to plausibly allege intentional discrimination, their claim could still move forward on injunctive and declaratory theories of relief." (Doc. No. 25 at 25).

"To recover compensatory damages for disability discrimination under Title II of the ADA, a plaintiff must also show that the discrimination was "intentional" in the sense that it was more than disparate impact." *Windham*, 875 F.3d at 235. At the pleading stage, however, "the question is not whether there is evidence to support the claim of intentional discrimination but whether the complaint plausibly alleges such discrimination." *Phillips v. Prator*, 2021 U.S. App. LEXIS 22947, *8-9. Knowledge of disability and indifference to requests is sufficient to satisfy the intentional standard at the motion to dismiss stage. *See id.* The Complaint alleges that Armstead,

> informed the officers that Mr. Lewis is a dialysis patient and his medical condition is managed through the use of an AV Fistula in his left forearm. Ms. Armstead further informed RPD that Mr. Lewis could not have tight items, such as handcuffs, around his left arm or wrist due to his medical condition.

(Doc. No. 1 at ¶ 23). These allegations are sufficient to establish intentional discrimination at the pleadings stage.

Accordingly, the Court denies Defendants' Motion to Dismiss as it relates to Lewis' ADA claims against the City.[13]

---

[13] In their Motion, Defendants argue the officers are entitled to qualified immunity. Examining the Complaint, it is clear the Plaintiff had only asserted ADA claims against the City of Rosenberg and the Rosenberg Police Department. (*See* Doc. No. 1 at 21). Therefore, any discussion of qualified immunity and clearly established ADA law is irrelevant. As discussed in depth later in this order, Plaintiff cannot assert claims against the RPD, so only the ADA claims against the City survive the Motion to Dismiss.

### V. Civil Theft/Conversion

In addition to the Fourth Amendment and ADA claims, Plaintiffs asserted a civil theft or conversion claim against all the Defendants for the alleged conversion of Armstead's cell phone and key fob. (Doc. No. 1 at 22). In its motion to dismiss Defendants argue the individual Officers are statutorily immune from the state law torts claims under Tex. Civ. Prac. & Rem. Code § 101.106(e). (Doc. No. 18 at 29). The Defendants also contend the Plaintiffs state law conversion claim against the City is barred by governmental immunity. Plaintiffs respond that "Texas courts have generally agreed that government agencies and their employees can be sued for conversion." (Doc. No. 25 at 32). The only pleadings in this regard concern Armstead's phone and keys; no property of Lewis is involved.

In Texas, under the doctrine of sovereign immunity, a governmental entity cannot be held liable for the actions of its employees unless there is a constitutional or statutory provision waiving such immunity. *See City of Amarillo v. Martin*, 971 S.W.2d 426, 427 (Tex.1998); *Dallas County Mental Health & Mental Retardation v. Bossley*, 968 S.W.2d 339, 341 (Tex.), cert. denied, 525 U.S. 1017, 119 S.Ct. 541, 142 L.Ed.2d 450 (1998); *Harris County v. Dillard*, 883 S.W.2d 166, 168 (Tex.1994). "Like the state, counties and other political subdivisions can only be liable where an exception to such immunity is provided for in the Texas Tort Claims Act." *Diaz*, 802 F.2d at 14 (citing Tex. Civ. Prac. & Rem. Code § 101.001(3)(B). The Texas Legislature enacted the Texas Tort Claims Act ("TTCA"), which waives sovereign immunity in certain scenarios.

To hold the City liable under the TTCA, a plaintiff's injuries must have been proximately caused by an employee's operation or use of a motor-driven vehicle or motor-driven equipment or by a condition or use of tangible real or personal property. Tex. Civ. Prac. & Rem. Code § 101.021. Here, the Plaintiffs' claims of civil theft and conversion "do not involve the operation or use of a

motor vehicle or the condition or use of tangible personal or real property." *Holland v. City of Houston*, 41 F. Supp. 2d 678, 712 (S.D. Tex. 1999). Therefore, they do not fall within the scope of the TTCA, and the City is immune from liability. The intentional tort claims against the City are dismissed.

The Texas Civil Practice and Remedies Code sets out the rules that govern actions against state employees. In particular the law provides that

> [i]f a suit is filed against an employee of a governmental unit based on conduct within the general scope of that employee's employment and if it could have been brought under this chapter against the governmental unit, the suit is considered to be against the employee in the employee's official capacity only.

Tex. Civ. Prac. & Rem. Code § 101.106(f). A suit that "could have been brought under this chapter" excludes intentional torts. Tex. Civ. Prac. & Rem.Code § 101.057(2); *Garcia v. Hackman*, No. CA C-12-249, 2013 WL 1767750, at *6 (S.D. Tex. Apr. 24, 2013). As mentioned, Plaintiffs have asserted a conversion and civil theft. These claims are intentional torts. *Garcia*, No. CA C-12-249, 2013 WL 1767750, at * 6 ("Pursuant to Texas law, conversion is an intentional tort"). Accordingly, their claims do not fall within the meaning of the Texas Tort Claims Act and they need not be construed as a "suit ... against [defendants] in [their] official capacity only" pursuant to § 101.106(f). Rather, Plaintiffs are allowed to proceed against the Defendants in their individual capacity for the intentional torts. *See id.*

That said, to prevail on a claim for conversion of personal property, "a plaintiff must prove that: (1) the plaintiff owned or had legal possession of the property or entitlement to possession; (2) the defendant unlawfully and without authorization assumed and exercised dominion and control over the property to the exclusion of, or inconsistent with the plaintiff's rights as an owner; (3) the plaintiff demanded return of the property; and (4) the defendant refused to return the property." *Apple Imps., Inc. v. Koole*, 945 S.W.2d 895, 899 (Tex. App.–Austin 1997, writ denied).

Plaintiffs did not plead sufficient facts to support a claim for conversion. As to the house keys and the vehicle key fob, Plaintiffs do not allege that the Officers exercised "dominion and control over the property." Instead, the keys were "located, still in the street." Armstead's claim for conversion of her cell phone also fails because the Complaint does not allege that the Officers "refused to return the property." Rather, once Armstead reported the cell phone missing, the Officers immediately met her back at the scene and returned her phone.

For this reason, the Court dismisses Plaintiffs' conversation/civil theft claims.

## VI. Municipal Liability

Plaintiffs allege that Defendants RPD and City of Rosenberg maintain "a practice, policy, and/or custom of using unnecessary and unreasonable force to execute detentions and arrest, … prolonging detentions without reasonable suspicion, … conducting searches of civilians without probable cause, …unjustifiably seizing property, … [and] not accomodat[ing] people with visible or known disabilities." (Doc. No. 1). In their Motion to Dismiss, Defendants first take issue with the fact that Plaintiffs asserted claims against both RPD and the City. Defendants contend that "the Rosenberg Police Department is not a jurisdictional entity separate from the City that has the capacity to be sued and should be dismissed." (Doc. No. 18 at 25). As to the claims against the City, the Defendants argue the Court should dismiss Plaintiffs' § 1983 claims since they have "made no factual allegations which show a claim against the City." (Doc. No. 18 at 25).

Starting with the contention that RPD is not a proper Defendant, the Court agrees. The capacity of an entity to sue or be sued "shall be determined by the law of the state in which the district court is held." Fed. R. Civ. P. 17(b). In Texas, "police departments are not legal entities capable of being sued in the absence of express action by the…city…to grant the servient agency with jural authority." *Darby v. Pasadena Police Dep't*, 939 F.2d 311, 313 (5th Cir. 1991)

32

(affirming the district court's dismissal of claims that were brought against a police department rather than the city after concluding that the police department had no capacity to sue or be sued). "Although the City of Rosenberg's Charter provides for the establishment and maintenance of a police department, the power to sue and be sued is reserved exclusively to the City." *Johnson v. Rosenberg Police Dep't*, No. 4:19-CV-01119, 2019 WL 3892331, at *2 (S.D. Tex. Aug. 19, 2019). "The City of Rosenberg's Charter does not grant Rosenberg P.D. the capacity to engage in separate litigation, nor does § 1983 confer jural existence on Rosenberg P.D., as an agent of the City." *Id.* Accordingly, Plaintiffs' claims against Rosenberg Police Department are hereby be dismissed, "as Rosenberg P.D. is *non sui juris* and lacks the capacity to sue or be sued as a separate legal entity." *Id.*

The City, however, may be liable under the law set out in *Monell v. Dept. of Soc. Servs.*, 436 U.S. 658, 691 (1978). While cities are not liable for their employees' unconstitutional acts under a claim of respondeat superior, municipal liability under § 1983 may attach if the plaintiff shows: (1) a policymaker; (2) an official policy; and (3) a violation of constitutional rights whose moving force is the policy or custom. *See Cox v. City of Dallas*, 430 F.3d 734, 748 (5th Cir. 2005) (citing *Piotrowski v. City of Houston*, 237 F.3d 567, 578 (5th Cir. 2001). At the motion to dismiss stage, the plaintiff need not identify a particular policymaker by name to establish municipal liability but must plead facts that show that the defendant or defendants acted pursuant to a specific official policy, which was promulgated or ratified by the legally authorized policymaker. *Groden v. City of Dallas, Tex.*, 826 F.3d 280, 282 (5th Cir. 2016). "[C]ourts should not grant motions to dismiss for failing to plead the specific identity of the policymaker." *Id.* at 285.

That said, a plaintiff must still "provide fair notice to the defendant, and this requires more than generically restating the elements of municipal liability." *Id.* Such allegations may include

"past incidents of misconduct to others, multiple harms that occurred to the plaintiff, misconduct that occurred in the open, the involvement of multiple officials in the misconduct, or the specific topic of the challenged policy or training inadequacy." *Id*; *see Custer v. Houston Police Dept.*, 2017 WL 5484114 (Nov. 15, 2017).

In total Plaintiff alleges five different practices, policies, or customs that violate Plaintiffs' constitutional rights:

- Using unnecessary and unreasonable force to execute detentions and arrests,
- Prolonging detentions without reasonable suspicion,
- Unreasonable searches,
- Unjustifiably seizing property, and
- Not accommodating people with visible or known disabilities.

(Doc. No. 1). Reduced to their essence, these alleged practices constitute three different violations: (1) expressly unconstitutional City policies, (2) a custom of unconstitutional policing, and (2) a failure to train officers not to violate the civil rights of residents.

### 1. *Express Violations*

Plaintiffs allege that the City maintains unconstitutional excessive force, unreasonable detention, unlawful arrests, and unreasonable search policies. In support of their contention, they direct the Court to the Rosenberg Police Department, General Orders 6.01 and 7.04. Both Orders are several pages long, and the Plaintiffs did not direct the Court to any particular rule or section with which they take issue. That said, the Court reviewed the Orders in their entity and do not believe the City had an express policy that encouraged, authorized, or allowed officers to act unconstitutionally.

In pertinent part, General Order 6.01 addresses the appropriate use of force and provides, in part, that "officers use only the force that is reasonably necessary to effectively bring an incident

34

under control." Rosenberg Police Department, General Order 6.01 Use of Force (June 19, 2020), available at https://www.rosenbergtx.gov/DocumentCenter/View/1968/GO-601.

Whereas General Order 7.04 discusses searches incident to arrest and other warrantless searches. Plaintiffs contend that this Order provides "a broad range of situations in which exigent circumstances apply" and presses "for officers to conduct searches contemporaneous with vehicle stops." (Doc. No. 1 at ¶ 65). Reviewing the text under the "emergency searches" and "vehicles" subheadings, it appears the Orders comply with the case law governing exigent circumstance and warrantless vehicle searches.

There is little doubt that the City's policies, regarding excessive force, unreasonable detention, unlawful arrests, and unreasonable searches on their face are constitutional. Considering the language of the policies, it is difficult to imagine what constitutional guarantees would be violated by conduct if one followed these principles. Therefore, the Court finds that General Orders 6.01 and 7.04 are not officially promulgated policies instructing police to investigate using unconstitutional methods. Thus, Plaintiff must show a well settled custom or practice or the City's failure to train led to the alleged harm.

### 2. *Institutionalized Conduct*

"[T]o plead a practice so persistent and widespread as to practically have the force of law, [the plaintiff] must do more than describe the incident that gave rise to his injury." *Ratliff*, 948 F.3d at 285 (citing *Pena v. City of Rio Grande City*, 879 F.3d 613, 622 (5th Cir. 2018)). A plaintiff may show a "persistent, widespread practice of City officials or employees, which, although not authorized by officially adopted and promulgated policy, is so common and well-settled as to constitute a custom that fairly represents municipal policy." *Piotrowski v. City of Houston*, 237 F.3d 567, 579 (5th Cir. 2001). That said, "[a]ctions of officers or employees of a municipality do

35

not render the municipality liable under section 1983 unless they execute official policy as above defined." *Id.* "[A] facially innocuous policy will support liability if it was promulgated with deliberate indifference to the 'known or obvious consequences' that constitutional violations would result." *Id.* "Deliberate indifference of this sort is a stringent test, and a showing of simple or even heightened negligence will not suffice to prove municipal culpability." *Id.*

The Fifth Circuit has previously found that for municipal liability to attach for an unofficial policy based on a custom or pattern, there must be a significant number of previous incidents placed in the context of the size of the police department, the number of criminal incidents investigated, and with specificity that the other incidents are fairly similar to what transpired in the present dispute. *Hicks-Fields*, 860 F.3d at 810; *see also Davidson v. City of Stafford*, 848 F.3d 384, 396-97 (5th Cir. 2017) (three arrests over three and a half years did not establish a pattern of constitutional violations); *Peterson v. City of Fort Worth*, 588 F.3d 838, 851-52 (5th Cir. 2009) (holding 27 complaints of excessive force over a period of three years in a department with more than 1,500 officers did not constitute a pattern); *Pineda v. City of Houston*, 291 F.3d 325, 329 (5th Cir. 2002) (holding eleven incidents cannot support a pattern of illegality in Houston); *Armstrong v. Ashley*, 60 F.4th 262, 277 (5th Cir. 2023) (holding nine cases over a twenty four year period was hardly sufficient to show a municipal custom); *Moreno v. City of Dallas*, 2015 WL 3890467 at *9 (N.D. Tex. June 18, 2015) (granting motion to dismiss because "facts suggesting an average of less than two incidents of excessive force per year over the course of five years are not sufficient to indicate a pattern of abuses"). Moreover, demonstrating a pattern requires similarity and specificity—prior indications cannot simply be for "any and all "bad" or unwise acts, but rather must point to the specific violation in question." *Peterson*, 588 F.3d 838 at 851 (quoting *Estate of Davis ex rel. McCully v. City of N. Richland Hills*, 406 F.3d 375, 383 (5th Cir. 2005). Isolated

incidents do not constitute a pattern because there must be "sufficiently numerous prior incidents" to qualify as a pattern." *Id.* (quoting *McConney v. City of Houston*, 863 F.2d 1180, 1184 (5th Cir. 1989)). The Court will address whether Plaintiffs have alleged sufficient incidents to constitute a "custom of practice" as to each claim.

### Unnecessary and Unreasonable Force to Execute Detentions and Arrests

As to the unnecessary and unreasonable force to execute detentions and arrests claim, Plaintiffs cited to three lawsuits, twelve civilian complaints, and two media reports where individuals claimed excessive force over eight years. First, there is no indication that any of the complaints have merit. Moreover, there is no indication who the complaining party is, so there may well be double-counting. Even setting aside that possibility, less than three incidents a year are insufficient to establish a custom or practice. *Peterson v. City of Fort Worth*, 588 F.3d 838, 851-52 (5th Cir. 2009) (holding 27 complaints of excessive force over a period of three years in a department with more than 1,500 officers did not constitute a pattern).

### Prolonging Detentions Without Reasonable Suspicion

Plaintiffs also claim the City has a custom and practice of prolonging detention without reasonable suspicion. As support, Plaintiffs point to six civilian complaints and one YouTube video over four years. This averages to less than two incidents a year. This is not sufficient to indicate a pattern or custom of abuse under *Monell*. *Moreno v. City of Dallas*, 2015 WL 3890467 at *9 (N.D. Tex. June 18, 2015) (granting motion to dismiss because "facts suggesting an average of less than two incidents of excessive force per year over the course of five years are not sufficient to indicate a pattern of abuses"). Again, there is no demonstrable showing that the complaints have merit, and the possibility of double counting exists.

37

**Unreasonable Searches**

Plaintiffs' third allegation is that RPD has a custom or practice of conducting unreasonable searches. Plaintiffs direct the Court to thirteen civilian complaints over five-and-a-half years. This averages less than three incidents a year. There is no indication of merit to any of these claims. This is insufficient to establish an unconstitutional practice.

**Unjustifiably Seizing Property**

In a time period of four years, Plaintiffs claim there were six incidents that constitute a custom and practice of unjustifiably seizing property—the incidents consist of four civilian complaints, one YouTube video, and a disciplinary order concerning an officer failing to immediately confiscate a phone. An average of less than two incidents a year is insufficient to establish a custom or pattern. *Monell. Moreno v. City of Dallas*, 2015 WL 3890467 at \*9 (N.D. Tex. June 18, 2015) (granting motion to dismiss because "facts suggesting an average of less than two incidents of excessive force per year over the course of five years are not sufficient to indicate a pattern of abuses"). Moreover, in this regard, the Court has found that the Plaintiffs' claims do not survive the Motion to Dismiss.

**Not Accommodating People with Visible or Known Disabilities**

Lastly, Plaintiffs allege that RPD consistently does not provide accommodations for people with disabilities. (Doc. No. 1 at ¶ 78). In support of their allegation of this custom or practice, Plaintiffs direct the Court to three lawsuits— the first one filed in 2011, the second one filed in 2016, and the last in 2021. Three lawsuits involving an alleged failure to accommodate people with visible or known disabilities over ten years is not sufficient to qualify as a "persistent, widespread practice of City officials or employees." *See Piotrowski v. City of Houston*, 237 F.3d 567, 579 (5th Cir. 2001).

Although Plaintiffs claim a total of thirty-eight civilian complaints, four separate media reports, four lawsuits, and a corrective action form in their Complaint, the Court does not find that these incidents are sufficient to meet the frequency or similar enough to meet the similarity requirements that are required to establish a pattern or practice for any of the alleged causes of action. Importantly, Plaintiff has not provided the Court with statistics/facts of how many similar incidents or investigations similar to the present dispute have taken place in the RPD or the size of the RPD department in question. There is no way of determining whether these incidents involved the same offender or officer or similar conduct. Additionally, the Complaint only describes a surface-level background of the incidents. Thus, the Court is unable to determine the degree of similarity between the incidents or credibility of any of the complaints.

For the reasons mentioned, this Court finds that these alleged incidents are not widespread or persistent enough to demonstrate a pattern or to suggest that an unofficial widespread practice exists that could essentially represent a municipal policy. Thus, Plaintiffs' § 1983 claims against the City must be dismissed for failure to state a claim.

### 3. *Failure to Train*

Plaintiffs, however, may still bring a *Monell* claim under a failure to train theory. The City may still be liable under *Monell* if the constitutional wrong was caused by the City's failure to train its employees. *City of Canton, Ohio v. Harris*, 489 U.S. 378, 387 (1989). Plaintiffs' Complaint states that the "RPD does not regularly train its officers on excessive force." (Doc. No. 1 at ¶ 58).

"[T]he inadequacy of police training may serve as the basis for § 1983 liability only where the failure to train amounts to deliberate indifference to the rights of persons with whom the police come into contact." *City of Canton, Ohio v. Harris*, 489 U.S. 378, 388 (1989). "[I]t may happen

that in light of the duties assigned to specific officers or employees the need for more or different training is so obvious, and the inadequacy so likely to result in the violation of constitutional rights, that the policymakers of the city can reasonably be said to have been deliberately indifferent to the need." *Id.* at 390. In that case, failure to provide proper training is said to represent a policy for which the city is responsible.

In a municipal liability failure to train case, the issue is whether the training program is adequate, and if not, whether inadequate training can justifiably be said to represent "city policy." *Id.* It is important to recognize that properly trained officers occasionally make mistakes; "the fact that they do says little about the training program or the legal basis for holding the city liable." *Id.* In addition to showing that the supervisor failed to train the subordinate officer the Plaintiff must also show "a causal link exists between the failure to train or supervise and the violation of the plaintiff's rights," and "the failure to train or supervise amounts to deliberate indifference." *Armstrong v. Ashley*, 60 F.4th 262, 277 (5th Cir. 2023).

Plaintiffs' bare allegations that "on information and belief, RPD does not regularly train its officers on excessive force" are insufficient to survive a motion to dismiss based on a failure to train claim under *Monell. Armstrong v. Ashley*, 60 F.4th 262, 277 (5th Cir. 2023) (Holding that the plaintiff's Monell claim based on failure to train failed where the plaintiff alleged that "Shreveport police officers received subpar training across the board" was "not enough to imply or state that policymakers acter with deliberate indifference.").

## VII. Conclusion

For the foregoing reasons, Defendant's Motion to Dismiss (Doc. No. 18) is **GRANTED in part** and **DENIED in part**. The Court grants Defendants' Motion to Dismiss on the following causes of action: unlawful detention, illegal seizure, civil theft/conversion against the City and

40

RPD, Armstead's excessive force claim, Lewis' claim for unlawful search and unlawful seizure, and all municipal liability claims against the City and RPD. The Court denies the Motion as it relates to Plaintiffs' claims for unlawful arrest, Armstead's claim for unlawful search, and Lewis' ADA and excessive force claims.

Signed at Houston, Texas, this 25th day of May, 2023.

Andrew S. Hanen
United States District Judge